UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PHOUVIENG K., <br><br> Petitioner, <br><br> v. <br><br> TONYA ANDREWS, Facility Administrator of Golden State Annex; SERGIO ALBARRAN, Acting Field Office Director of the San Francisco Immigration and Customs Enforcement Office; TODD LYONS, Acting Director of U.S. Immigration and Customs Enforcement; KRISTI NOEM, Secretary of the United States Department of Homeland Security; PAMELA BONDI, Attorney General of the United States, <br><br> Respondents. | No. 1:25-cv-01512-KES-SAB (HC) <br><br> ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION <br><br> Docs. 1, 3 |

Petitioner Phouvieng K. brings this habeas action concerning his re-detention by immigration authorities.[1] Petitioner initially remained detained after he was ordered removed, but in 2012 immigration authorities released petitioner on an order of supervision after determining that there was not a likelihood of his removal at that time. Thirteen years later, ICE agents re-detained petitioner on October 14, 2025, when he appeared for a scheduled check-in. This matter is before the Court on petitioner's motion for temporary restraining order seeking his release and a pre-deprivation hearing before any re-detention. Doc. 3. For the reasons explained below,

---

[1] As recommended by the Committee on Court Administration and Case Management of the Judicial Conference of the United States, the Court omits petitioner's full name, using only his first name and last initial, to protect sensitive personal information. *See* Memorandum re: Privacy Concern Regarding Social Security and Immigration Opinions, Committee on Court Administration and Case Management, Judicial Conference of the United States (May 1, 2018), https://www.uscourts.gov/sites/default/files/18-cv-l-suggestion_cacm_0.pdf.

petitioner's motion for temporary restraining order, which the Court converts to a motion for preliminary injunction, is granted.

**I.    Background**[2]

Petitioner was born in a refugee camp in Thailand in 1978.  Doc. 1-1, Ex. A, Phouvieng K. Decl. at ¶¶ 4–5.  His parents had fled the war in their home country of Laos.  *Id.*  Shortly after petitioner was born, his father abandoned the family.  *Id.*  Petitioner and his mother left Thailand when petitioner was three years old, and the United States accepted them as refugees.  *Id.*  They became lawful permanent residents and settled in New Orleans.  *Id.*; Doc. 1-1, Ex. B.  His mother subsequently remarried.  Doc. 1-1, Ex. A, Phouvieng K. Decl. at ¶ 6.

When petitioner was a teenager, he, his mother, and his stepfather relocated to Weed, California.  *Id.* ¶ 7.  There, petitioner indicates he was bullied and often physically assaulted by gang members, which led him to drop out of school.  *Id.* ¶¶ 8–9.  Petitioner states that he joined a rival gang for a period to seek protection from those gang members but later dropped out of the gang.  *Id.*  On May 20, 1996, when petitioner was seventeen years old, he shot and killed a man.  *Id.*  He pleaded guilty to second degree murder and was sentenced to 15 years to life in prison.  *Id.*  Petitioner states that, while in prison, he earned his GED, took vocational courses, and volunteered to teach other prisoners to read.  *Id.* ¶ 12.

In 2012, after seventeen years in prison, petitioner was released on parole.  *Id.* ¶ 14.  Immigration authorities then charged petitioner as removable due to his conviction.  *Id.*; Doc. 1-1, Ex. B.  Petitioner was released from prison to ICE custody and was detained pending removal proceedings.  Doc. 1-1, Ex. A, Phouvieng K. Decl. at ¶ 14.  On June 18, 2012, an immigration judge ordered petitioner removed to Laos.  Doc. 1-1, Ex. C; Doc. 6, Gallenkamp Decl. at ¶ 8.  Petitioner is a citizen of Laos, but he has never lived in or visited that country.  Doc. 6, Gallenkamp Decl. at ¶ 5; Doc. 1-1, Ex. A, Phouvieng K. Decl. at ¶ 14.

Notwithstanding the removal order, ICE was unable to remove petitioner to Laos because,

---

[2] The facts set out in this section come from petitioner's verified petition and other evidence in the record.  A court "may treat the allegations of a verified . . . petition [for writ of habeas corpus] as an affidavit." *L. v. Lamarque*, 351 F.3d 919, 924 (9th Cir. 2003) (citing *McElyea v. Babbitt*, 833 F.2d 196, 197–98 (9th Cir. 1987)).

1  as petitioner asserts and respondents do not dispute, there is no formal repatriation agreement
2  between the United States and Laos.  *See* Doc. 1 at ¶ 26; Doc. 1-1, Ex. A, Phouvieng K. Decl. at
3  ¶¶ 14–16; *see* Doc. 6.  Petitioner was therefore released from detention on an order of supervision
4  on August 21, 2012.  *See* Doc. 1 at ¶ 26; Doc. 1-1, Ex. A, Phouvieng K. Decl. at ¶¶ 14–16; Doc.
5  6, Gallenkamp Decl. at ¶ 5; Doc. 1-1, Ex. E.  The order of supervision required that he abide by
6  certain conditions: he was required to report for annual check-ins, not commit any crimes, and
7  assist ICE in obtaining travel documents for his removal, among other things.  *See* Doc. 1-1,
8  Ex. E.
9       The regulations that authorize ICE to release a noncitizen who has been ordered removed
10  provide:

> Before making any . . . decision to release a detainee, a majority of the Review Panel members, or the Director of the HQPDU in the case of a record review, must conclude that:
>
> 1) Travel documents for the alien are not available or, in the opinion of the Service, immediate removal, while proper, is otherwise not practicable or not in the public interest;
>
> 2) The detainee is presently a non-violent person;
>
> 3) The detainee is likely to remain nonviolent if released;
>
> 4) The detainee is not likely to pose a threat to the community following release;
>
> 5) The detainee is not likely to violate the conditions of release; and
>
> 6) The detainee does not pose a significant flight risk if released.

21  8 C.F.R. § 241.4(e); *see also* 8 C.F.R. §§ 241.4(h)(3), (i)(6) (noting that the Executive Associate
22  Commissioner and district director "must [also] be able to reach the conclusions set forth in
23  paragraph (e) of this section" "[b]efore making any decision to release a detainee").
24       Following his release, petitioner met and married his wife and took in her four children as
25  his own.  Doc. 1-1, Ex. A, Phouvieng K. Decl. at ¶¶ 18–19.  He enrolled in a reentry program and
26  worked in several jobs, such as construction and produce distribution.  *Id.*  He and his wife are
27  members and active participants in several community groups, and they volunteer with
28  Alcoholics Anonymous.  *Id.* ¶ 20.  In 2022, petitioner was accepted into a five-year electrical

3

1   apprenticeship program, and he is halfway through the training. *Id.* ¶ 24. He volunteers on

2   behalf of the union that runs the apprenticeship program. *Id.* Respondents do not dispute

3   petitioner's assertion that he has not been arrested or cited for any crime since his release from

4   prison in 2012. *Id.* ¶ 25. Respondents also do not allege that petitioner has violated any

5   condition of his order of supervision since his release. *See* Doc. 6.

6         On September 14, 2025, petitioner reported for his annual check-in at the San Francisco

7   ICE office, and an ICE agent handed him a form that they would use to request a travel document

8   from Laos. Doc. 1-1, Ex. A, Phouvieng K. Decl. at ¶¶ 26–27. The agent instructed him to fill out

9   the form and return two weeks later.[3] *Id.*

10        On October 14, 2025, ICE agents detained petitioner when he reported to the San

11  Francisco ICE office as instructed. *Id.* ¶¶ 28–30. ICE kept him in a holding cell at the office for

12  two days. *Id.* ¶ 31. On October 15, 2025, petitioner indicates that an ICE agent told him to sign a

13  document, and petitioner told the agent that his lawyer had instructed him not to sign any

14  document without his lawyer reviewing it first. *Id.* ¶ 32. Petitioner states that the agent would

15  not allow him to read the document. *Id.* The declaration of deportation officer Gallenkamp states

16  that petitioner was served with a notice of revocation of release on that date. Doc. 6, Gallenkamp

17  Decl. at ¶ 13. The notice of revocation of release states:

18          ICE has determined that you can be expeditiously removed from the
        United States pursuant to the outstanding order of removal against
19          you. On June 18, 2012, you were ordered removed to Laos . . . . On
        August 21, 2012, you were released on an Order of Supervision,
20          Form I-220B, pending issuance of your travel document to Laos.
        Your case is currently under review by the Government of Laos for
21          the issuance of a travel document and your removal from the U.S. is

---

[3] The declaration of deportation officer Gallenkamp states that, on September 30, 2025, ICE provided petitioner a form to request a travel document and told petitioner to fill out the form and bring it to his next appointment, but that when petitioner showed up for his next appointment, he had not filled out the form. Doc. 6, Gallenkamp Decl. at ¶¶ 11–12. Petitioner's declaration explains that the ICE officer who gave him the form did not explain how to fill it out and the form was not self-explanatory. Doc. 1-1, Ex. A, Phouvieng K. Decl. at ¶¶ 26–27 ("For example, the Laos travel document form asked me where in the country I was born, but I did not know how to answer, considering that I was born in a refugee camp in Thailand."). Respondents do not allege that petitioner violated his release conditions. *See* Doc. 6. The notice of revocation of release states that petitioner was taken into custody because his "removal is now imminent"; it does not assert a violation of any condition of petitioner's order of supervision. Doc. 1-1, Ex. G.

now imminent.

Doc. 1-1, Ex. F.  The notice continues: "Based on the above, and pursuant to 8 C.F.R. § 241.4 / 8 C.F.R. § 241.13, you are to remain in ICE custody at this time."  *Id.*  On October 16, 2025, petitioner was transported to Golden State Annex, where he remains detained.  *Id.* ¶ 35.

## II.     Procedural History

On November 6, 2025, petitioner filed a petition for writ of habeas corpus, Doc. 1, and a motion for temporary restraining order, Doc. 3.  He argues in the motion that ICE failed to comply with its regulations governing the revocation of an order of supervision when it re-detained him, and that the Due Process Clause required that he be provided a hearing prior to any re-detention.  *See* Doc. 3.[4]  Respondents filed an opposition to the motion for temporary restraining order on November 14, 2025, Doc. 6, and petitioner filed a reply on November 19, 2025, Doc. 7.

## III.    Conversion of the Motion

When the Court set a briefing schedule on the motion, it ordered the parties to state their position on whether the motion for temporary restraining order should be converted to a motion for preliminary injunction and whether the parties requested a hearing on the motion.  Doc. 4.  Neither party objected to converting the motion to one for a preliminary injunction, and neither party requested a hearing.  *See* Docs. 6, 7.  Given that the standard for issuing a temporary restraining order is the same as for a preliminary injunction, *see Stuhlbarg Int'l Sales Co. v. John D. Bush & Co.,* 240 F.3d 832, 839 n.7 (9th Cir. 2001), and respondents had notice and opportunity to respond through a written opposition, petitioner's motion is converted to a motion for preliminary injunction.

## IV.    Legal Standard

"A preliminary injunction is an extraordinary remedy never awarded as of right."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citing *Munaf v. Geren*, 553 U.S. 674, 689–

---

[4] In the petition, petitioner also asserts that due process requires that he be provided meaningful notice and an opportunity to present a fear-based claim if ICE attempts to remove him to a third country, contrary to ICE's current policies.  Doc. 1 at ¶¶ 93–98.  That claim is not presently before the Court.  *See* Doc. 3.

5

90 (2008)). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20 (citing *Munaf*, 553 U.S. at 689–90; *Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 542 (1987); *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311–12 (1982)). "Likelihood of success on the merits is a threshold inquiry and is the most important factor." *Simon v. City & Cnty. of San Francisco*, 135 F.4th 784, 797 (9th Cir. 2025) (quoting *Env't Prot. Info. Ctr. v. Carlson*, 968 F.3d 985, 989 (9th Cir. 2020)). "[I]f a plaintiff can only show that there are serious questions going to the merits—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the balance of hardships tips sharply in the plaintiff's favor, and the other two *Winter* factors are satisfied." *Friends of the Wild Swan v. Weber*, 767 F.3d 936, 942 (9th Cir. 2014) (internal quotation marks and citations omitted).

**V.    Discussion**

    **a.  Likelihood of Success on the Merits**

Petitioner argues that ICE's revocation of his release violated its own regulations governing how and when ICE may revoke release, as well as the Due Process Clause of the Fifth Amendment. *See* Doc. 1 at ¶¶ 107–30. The Court addresses those arguments below.

        **i.  ICE Did Not Have Proper Grounds to Detain Petitioner Under the Governing Regulations.**

Specific regulations, 8 C.F.R. §§ 241.13(i) and 241.4(l), govern how and when ICE may revoke the release of a noncitizen who has been ordered removed, detained, and then released after ICE is unable to execute the order of removal. Section 241.13(i) permits revocation of release "if, on account of changed circumstances, [ICE] determines that there is a significant likelihood that the alien may be removed in the reasonably foreseeable future."[5] 8 C.F.R. § 241.13(i)(2).

---

[5] The regulation also provides for revocation if a noncitizen "violates any of the conditions of release" in the "order of supervision," 8 C.F.R. § 241.13(i)(1). Respondents do not allege that this provision of the regulation applies, and they do not allege that petitioner violated any condition of his release. *See* Doc. 6.

6

### 1. Burden of Proof

Numerous courts have found that when ICE revokes the release of a noncitizen who has been ordered removed to effectuate that noncitizen's removal, "it is [ICE's] burden to show a significant likelihood that the alien may be removed." *E.g.*, *Escalante v. Noem*, No. 9:25-CV-00182-MJT, 2025 WL 2206113, at *3 (E.D. Tex. Aug. 2, 2025); *see Nguyen v. Hyde*, 788 F. Supp. 3d 144, 150 (D. Mass. 2025). *Nguyen v. Hyde*, for example, dealt with a noncitizen who had been ordered removed to Vietnam, had been released after ICE was unable to remove him, and then had his release revoked on the grounds that he could now be removed to Vietnam. *Nguyen*, 788 F. Supp. 3d at 146–149.

The *Nguyen* court first considered the framework set out in *Zadvydas v. Davis*, 533 U.S. 678 (2001), which dealt with a noncitizen who had been detained and never released following a final order of removal. *Zadvydas*, 533 U.S. at 701. In that context, the Supreme Court held that once an alien has been detained for six months and "provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the Government must respond with evidence sufficient to rebut that showing." *Id.*

The *Nguyen* court found that the burden-shifting framework from *Zadvydas* does not apply when a noncitizen has been ordered removed, is subsequently released on an order of supervision because the removal order could not be executed, and is then re-detained later. *Nguyen*, 788 F. Supp. 3d at 146–149. The court explained that "[t]his case is not about ICE's authority to detain in the first place upon an issuance of a final order of removal as in *Zadvydas*[;] [t]his case is about ICE's authority to *re-detain* [petitioner] after he was issued a final order of removal, detained, and subsequently released on an [order of supervision]." *Id.*; *cf. Escalante v. Noem*, No. 9:25-CV-00182-MJT, 2025 WL 2206113, at *3 (E.D. Tex. Aug. 2, 2025) ("[T]his is not your typical first round detainment of an alien awaiting removal. Petitioner was previously detained, then released on supervised release for several years, and his 90-day removal period expired."). As the *Nguyen* court explained, the regulations at 8 C.F.R. §§ 241.13(i) and 241.4(l) apply to non-citizens in petitioner's situation and outline the process to be followed. *Id.*; *Escalante*, 2025 WL 2206113, at *3 ("After *Zadvydas*, the immigration regulations were revised

7

to implement administrative review procedures for . . . those who are re-detained upon revocation of their supervised release." (citing 8 C.F.R. § 241.13)).

In *Escalante*, which also dealt with a noncitizen who had been ordered removed, released, and then re-detained, the court noted that:

> Section 241.13(i)(2)[,] [which is] entitled "Revocation for removal[,]" provides that "the Service may revoke an alien's [supervised] release under this section and return the alien to custody if, on account of changed circumstances, *the Service determines* that there is a significant likelihood that the alien may be removed in the reasonably foreseeable future." 8 C.F.R. § 241.13(i)(2) (emphasis added). Section 241.4(b)(4)[,] which is entitled "*Service determination under 8 C.F.R. 241.13*[,]" states that, after supervised release under section 241.13, "*if the Service subsequently determines*, because of a change of circumstances, that there is a significant likelihood that the alien may be removed in the reasonably foreseeable future [to the country to which the alien was ordered removed or] a third county, the alien shall again be subject to the custody review procedures under this section." 8 C.F.R. § 241.4(b)(4) (emphasis added).

*Escalante*, 2025 WL 2206113, at *1–3.

Those regulations indicate that, when ICE revokes release to effectuate removal, "it is [ICE's] burden to show a significant likelihood that the alien may be removed." *Escalante*, 2025 WL 2206113, at *3. As the district court in *Escalante* found, "[i]mposing the burden of proof on the alien each time he is re-detained would lead to an unjust result and serious due process implications." *Id.* Other courts have also reached this conclusion. *Roble v. Bondi*, No. 25-CV-3196 (LMP/LIB), 2025 WL 2443453, at *4 (D. Minn. Aug. 25, 2025) ("[T]he regulations at issue in this case place the burden on ICE to first establish changed circumstances that make removal significantly likely in the reasonably foreseeable future."); *Abuelhawa v. Noem*, No. 4:25-CV-04128, 2025 WL 2937692, at *8 (S.D. Tex. Oct. 16, 2025) ("[U]pon revocation of release, the Government bears the burden to show a significant likelihood that the alien may be removed in the reasonably foreseeable future."); *see Nguyen*, 788 F. Supp. 3d at 150. Therefore, the Court must determine whether respondents have met their burden to show a changed circumstance indicating a significant likelihood of removal in the reasonably foreseeable future.

///

///

**2. Analysis**

Respondents argue that circumstances have changed because, according to the declaration of the deportation officer: "Laos is currently issuing travel documents and is accepting deportees from the United States. In 2025, ICE [] has successfully removed aliens with final orders of removal to Laos. . . . [ICE] completed a travel document request and submitted it to [Laos]." Doc. 6 at 3; Doc. 6, Gallenkamp Decl. at ¶¶ 14–15.[6] The declaration indicates that "ERO anticipates a prompt response from Government of Laos." Doc. 6, Gallenkamp Decl. at ¶ 15.

The deportation officer's declaration does not establish that there is a significant likelihood of petitioner's removal in the reasonably foreseeable future. The statement that "ICE has successfully removed aliens with final orders of removal to Laos" does not establish the frequency or likelihood of any such removals to Laos or identify any considerations the Government of Laos might take into account when deciding whether to issue a travel document for petitioner. Notably, although the declaration asserts that petitioner's removal is "imminent," respondents do not identify any response or other statement by the Government of Laos with respect to the government's request for a travel document for petitioner, although it is now over a month since the government re-detained petitioner. Respondents do not explain why Laos did not issue a travel document for petitioner in the past, or why Laos is likely to issue a travel document for petitioner in the reasonably foreseeable future. Moreover, respondents do not dispute petitioner's assertion that there is still no repatriation agreement in place between the United States and Laos. *See* Doc. 1 at ¶ 26; Doc. 6.

The record of this case provides reason to doubt that Laos will issue a travel document for petitioner in the reasonably foreseeable future. Respondents do not explain why ICE has been unable to remove petitioner for the past thirteen years, but it appears to be because ICE was

---

[6] Petitioner objects to the declaration of deportation officer Gallenkamp because, petitioner argues, it does not establish her personal knowledge regarding any of the purported changed circumstances of petitioner's case or deportations to Laos in general. Doc. 7 at 3–4. The Court need not decide this issue as, even considering the declaration, respondents do not establish that there is a significant likelihood of petitioner's removal in the reasonably foreseeable future.

9

unable to obtain travel documents for him or his removal was otherwise not practicable.[7] "An undue delay in removal for an individual alien beyond the typical removal period would naturally suggest that removal is unlikely." *Chun Yat Ma v. Asher*, No. 11-cv-01797-MJP, 2012 WL 1432229, at *5 (W.D. Wash. Apr. 25, 2012). The fact that petitioner was not born in Laos and has never been to that country may also affect the likelihood of Laos issuing a travel document for him; however, respondents do not address Laos's policies or practices in such circumstances.[8]

In these circumstances, respondents have not shown that there is a significant likelihood of petitioner's removal to Laos in the reasonably foreseeable future. *See Hoac v. Becerra*, No. 2:25-CV-01740-DC-JDP, 2025 WL 1993771, at *4 (E.D. Cal. July 16, 2025) ("Respondents have not provided any details about why a travel document could not be obtained in the past, nor have they attempted to show why obtaining a travel document is more likely this time around."); *Liu v. Carter*, No. 25-cv-03036-JWL, 2025 WL 1696526, at *2 (D. Kan. June 17, 2025) (finding that the respondents had not shown that removal was reasonably foreseeable where they did not provide evidence why seeking travel documentation was more likely to be successful this time around or describe other actions taken to make the petitioner's removal more likely). The phrase "significant likelihood" requires something more than a mere possibility that removal will occur. Evidence that "there is at least some possibility that" the designated country of removal "will accept Petitioner at some point . . . is not the same as a significant likelihood that he will be

---

[7] The regulations that authorize ICE to release a noncitizen following a final order of removal provide that an appropriate official "must conclude that[] . . . [t]ravel documents for the alien are not available or, in the opinion of the Service, immediate removal, while proper, is otherwise not practicable or not in the public interest[.]" 8 C.F.R. § 241.4(e)(1); *see also* 8 C.F.R. §§ 241.4(h)(3), (i)(6) (noting that the Executive Associate Commissioner and district director "must be able to reach the conclusions set forth in paragraph (e) of this section" "[b]efore making any decision to release a detainee").

[8] Nor have respondents attempted to meet their burden by, for example, providing statistics regarding recent removals of Laos citizens. As the *Nguyen* court pointed out in the context of removals to Vietnam: If the government "submitted 350 requests and Vietnam issued travel documents for 328 individuals, Respondents may very well have shown that removal is significantly likely in the reasonably foreseeable future. On the other hand, if [the government] submitted 3,500 requests and only 328 individuals received travel documents, Respondents would not be able to meet their burden." *Nguyen*, 788 F. Supp. 3d at 151.

accepted in the reasonably foreseeable future." *Nguyen v. Scott*, No. 2:25-CV-01398, 2025 WL 2419288, at *16 (W.D. Wash. Aug. 21, 2025).

Detention is permissible only if ICE can show that there is a significant likelihood of removal in the reasonably foreseeable future (or if there was a violation of the order of supervision, which respondents do not allege here). *See* 8 C.F.R. § 241.13(i). ICE re-detained petitioner without making that showing and without complying with the regulation. "ICE, like any agency, 'has the duty to follow its own federal regulations.'" *Rombot v. Souza*, 296 F. Supp. 3d 383, 388 (D. Mass. 2017) (quoting *Haoud v. Ashcroft*, 350 F.3d 201, 205 (1st Cir. 2003)); *see Fed. Defs. of New York, Inc. v. Fed. Bureau of Prisons*, 954 F.3d 118, 130 (2d Cir. 2020) ("[U]nder deeply rooted principles of administrative law, not to mention common sense, government agencies are generally required to follow their own regulations."); *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 265–68 (1954).

Courts have held that "where an immigration 'regulation is promulgated to protect a fundamental right derived from the Constitution or a federal statute . . . and [ICE] fails to adhere to it, the challenged [action] is invalid.'" *Rombot*, 296 F. Supp. 3d at 388 (quoting *Waldron v. I.N.S.*, 17 F.3d 511, 518 (2d Cir. 1993)); *Hoac*, 2025 WL 1993771, at *5 ("[Because] Petitioner has [] shown it is likely that there is no change in circumstances such that Petitioner will be removed to Vietnam in the reasonably foreseeable future as required by § 241.13(i)(2)[,] . . . Petitioner has shown a likelihood of success . . . [on his claim] that his re-detainment is unlawful. . . ."). Petitioner is likely to succeed on his claim that his detention is unlawful for this reason.[9]

### ii. The Due Process Clause Requires a Hearing Prior to Re-Detention in Petitioner's Circumstances.

Petitioner further argues that the Due Process Clause bars ICE from re-detaining him without first providing a hearing where it must show that he is a flight risk or danger.[10] *See* Doc.

---

[9] Given this conclusion, the Court declines to address petitioner's remaining arguments regarding the regulations—that the ICE Field Office Director did not make the required findings prior to revoking release and that petitioner was not afforded an informal interview—at this time.

[10] Respondents' response, in a footnote in their opposition (*see* Doc. 6 at n.2), is that the

11

3-1 at 20–25. Civil immigration detention is typically justified only when a noncitizen presents a risk of flight or danger to the community. *See Zadvydas v. Davis*, 533 U.S. 678, 690 (2001); *Padilla v. ICE*, 704 F. Supp. 3d 1163, 1172 (W.D. Wash. 2023). Petitioner's due process claim is analyzed "in two steps: the first asks whether there exists a protected liberty interest under the Due Process Clause, and the second examines the procedures necessary to ensure any deprivation of that protected liberty interest accords with the Constitution." *Garcia v. Andrews*, No. 2:25-cv-01884-TLN-SCR, 2025 WL 1927596, at *2 (E.D. Cal. July 14, 2025) (citing *Kentucky Dep't of Corrections v. Thompson*, 490 U.S. 454, 460 (1989)).

### 1. Petitioner Possesses a Protected Liberty Interest.

A protected liberty interest may arise from a conditional release from physical restraint. *Young v. Harper*, 520 U.S. 143, 147–49 (1997). Even when a statute allows the government to arrest and detain an individual, a protected liberty interest under the Due Process Clause may entitle the individual to procedural protections not found in the statute. *See id.* (due process requires pre-deprivation hearing before revocation of preparole); *Gagnon v. Scarpelli*, 411 U.S. 778, 782 (1973) (same, in probation context); *Morrissey v. Brewer*, 408 U.S. 471, 482 (1972) (same, in parole context). To determine whether an individual's conditional release rises to the level of a protected liberty interest, "[c]ourts have resolved the issue by comparing the specific conditional release in the case before them with the liberty interest in parole as characterized by *Morrissey*." *Gonzalez-Fuentes v. Molina*, 607 F.3d 864, 887 (1st Cir. 2010) (internal quotation marks and citation omitted).

In *Morrissey*, the Supreme Court explained that parole from a criminal conviction "enables [the parolee] to do a wide range of things open to persons" who have never been in custody or convicted of any crime, including to live at home, work, and "be with family and friends and to form the other enduring attachments of normal life." *Morrissey*, 408 U.S. at 482. "Though the [government] properly subjects [the parolee] to many restrictions not applicable to

---

government should not bear the burden of proof, and that a clear and convincing evidence standard should not apply, at any future hearing required by due process. That argument is addressed below.

other citizens," such as monitoring and seeking authorization to work and travel, his "condition is very different from that of confinement in a prison." *Id.* "The parolee has relied on at least an implicit promise that parole will be revoked only if he fails to live up to the parole conditions." *Id.* The revocation of parole undoubtedly "inflicts a grievous loss on the parolee." *Id.* (quotations omitted). Therefore, a parolee possesses a protected interest in his "continued liberty." *Id.* at 481–84.

Petitioner's release from ICE detention in 2012 was similar. For over thirteen years, it allowed him to live in the United States under an order of supervision. Among other things, petitioner married his wife and started a family, supported his family by working, began an electrical apprenticeship, and volunteered for various organizations. *See* Doc. 1-1, Ex. A, Phouvieng K. Decl. at ¶¶ 18–25. Petitioner complied with all conditions of his release and was awaiting his credible fear interview with an asylum officer so that he could proceed with seeking relief in his immigration case. *See id.*; Doc. 9-1 at 33.

The Court finds that petitioner had a protected liberty interest in his release. *See* 8 C.F.R. § 241.13(i); *Guillermo M. R. v. Kaiser*, No. 25-CV-05436-RFL, 2025 WL 1983677, at *4 (N.D. Cal. July 17, 2025) (recognizing that "the liberty interest that arises upon release [from immigration detention] is *inherent* in the Due Process Clause"); *Ortega v. Kaiser*, No. 25-cv-05259-JST, 2025 WL 1771438, at *3 (N.D. Cal. June 26, 2025) (collecting cases finding that noncitizens who have been released have a strong liberty interest). The Court must therefore determine what process is due before the government may terminate his liberty.

### 2. A Pre-Deprivation Hearing is Required.

Due process "is a flexible concept that varies with the particular situation." *Zinermon v. Burch*, 494 U.S. 113, 127 (1990). The procedural protections required in a given situation are evaluated using the *Mathews v. Eldridge* factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural

1 requirement would entail.

*Id.* (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)); *see Hernandez v. Sessions*, 872 F.3d 976, 993 (9th Cir. 2017) (applying *Mathews* factors in immigration detention context).

Turning to the first factor, petitioner has a significant private interest in remaining free from detention. "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). Petitioner had been out of custody for over thirteen years, and during that time, he married, started a family, and developed significant ties in the community. His detention denies him that freedom.

Second, the risk of an erroneous deprivation of liberty is high because 8 C.F.R. §§ 241.13 and 241.4 do not provide for review of ICE's reasons for revocation by a neutral arbiter. "A neutral judge is one of the most basic due process protections." *Castro-Cortez v. INS*, 239 F.3d 1037, 1049 (9th Cir. 2001), *abrogated on other grounds by Fernandez-Vargas v. Gonzales*, 548 U.S. 30 (2006). As another decision in this district found in evaluating a similar set of claims brought by a noncitizen who had been ordered removed, was subsequently released, and was then re-detained, "[t]he lack of any neutral review [under the regulations] creates a heightened risk of deprivation for Petitioner." *Yang v. Kaiser*, No. 2:25-CV-02205-DAD-AC (HC), 2025 WL 2791778, at *9 (E.D. Cal. Aug. 20, 2025). Here, ICE revoked petitioner's release on the grounds that his removal was reasonably foreseeable, but the government's declaration does not provide any information concerning petitioner's specific circumstances that would establish a significant likelihood that petitioner's removal is, in fact, reasonably foreseeable anytime soon. In circumstances like these, the risk of erroneous deprivation is high. *See Yang*, 2025 WL 2791778, at *9.

Third, although the government has a strong interest in enforcing the immigration laws, the government's interest in detaining petitioner without a hearing is "low." *Ortega v. Bonnar*, 415 F. Supp. 3d 963, 970 (N.D. Cal. 2019); *Doe v. Becerra*, No. 2:25-cv-00647-DJC-DMC, 2025 WL 691664, at *6 (E.D. Cal. March 3, 2025); *see also Morrissey*, 408 U.S. at 483 (noting that "the State has an *overwhelming interest* in being able to return the individual to imprisonment

without the burden of a new adversary criminal trial[,] . . . [y]et, the State has *no interest* in revoking parole without some informal procedural guarantees."). In immigration court, custody hearings are routine and impose a "minimal" cost. *Doe*, 2025 WL 691664, at *6. "If the government wishes to re-arrest [petitioner] at any point, it has the power to take steps toward doing so; but its interest in doing so without a hearing is low." *Ortega*, 415 F. Supp. 3d at 970.

On balance, the *Mathews* factors show that petitioner is entitled to a bond hearing, which should have been provided before he was detained. "'[T]he root requirement' of the Due Process Clause" is "'that an individual be given an opportunity for a hearing *before* he is deprived of any significant protected interest.'" *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 542 (1985) (quoting *Boddie v. Connecticut,* 401 U.S. 371, 379 (1971)); *see Zinermon*, 494 U.S. at 127 ("Applying [the *Mathews*] test, the Court usually has held that the Constitution requires some kind of a hearing *before* the State deprives a person of liberty . . . ."). The Supreme Court has held that Due Process requires a pre-deprivation hearing before those released on parole from a criminal conviction can have their bond finally revoked. *See Morrissey*, 408 U.S. at 480–86. The same is true for those subject to revocation of probation. *Gagnon v. Scarpelli*, 411 U.S. at 782. Numerous district courts have held that these principles extend to the context of immigration detention.[11] Petitioner's re-detention without such a hearing violates the Due Process Clause.

### 3. Burden of Proof

In *Singh v. Holder*, the Ninth Circuit held, in the context of hearings provided for those detained under § 1226(c), that "the substantial liberty interest at stake" warranted placing the burden on the government to prove "that an alien is a flight risk or a danger to the community to justify denial of bond." *Singh v. Holder*, 638 F.3d 1196, 1203 (9th Cir. 2011) (requiring proof by

---

[11] *See, e.g.*, *Yang*, 2025 WL 2791778, at *7–10; *Khan v. Noem*, No. 1:25-CV-01411-EPG-HC, 2025 WL 3089352, at *6 (E.D. Cal. Nov. 5, 2025); *Qazi v. Albarran*, No. 2:25-CV-02791-TLN-CSK, 2025 WL 3033713, at *4 (E.D. Cal. Oct. 10, 2025); *Ramirez Clavijo v. Kaiser*, No. 25-CV-06248-BLF, 2025 WL 2419263, at *4–6 (N.D. Cal. Aug. 21, 2025); *Garcia*, 2025 WL 1927596, at *5; *Pinchi v. Noem,* No. 25-CV-05632-RMI (RFL), 2025 WL 1853763, at *1 (N.D. Cal. July 4, 2025); *Ortega*, 415 F. Supp. 3d at 970; *Doe*, 2025 WL 691664, at *6; *Diaz v. Kaiser*, No. 3:25-cv-05071, 2025 WL 1676854, at *2 (N.D. Cal. June 14, 2025); *Romero v. Kaiser*, No. 22-cv-02508-TSH, 2022 WL 1443250, at *4 (N.D. Cal. May 6, 2022); *Vargas v. Jennings*, No. 20-cv-5785-PJH, 2020 WL 5074312, at *4 (N.D. Cal. Aug. 23, 2020).

clear and convincing evidence as to flight or danger), *abrogated on other grounds by Jennings v. Rodriguez*, 583 U.S. 281 (2018); *see also Rodriguez Diaz v. Garland*, 53 F.4th 1189, 1199 (9th Cir. 2022) (explaining that *Singh*'s holding in this regard was based on general principles of due process).  The Ninth Circuit later extended these principles to bond hearings for those detained under § 1225(b) and § 1231(a).  *See Diouf v. Napolitano*, 634 F.3d 1081, 1082 (9th Cir. 2011); *Rodriguez v. Robbins*, 715 F.3d 1127, 1144 (9th Cir. 2013) ("*Rodriguez*").[12]

In *Rodriguez Diaz*, the Ninth Circuit held that § 1226(a), which places the burden of proof on the detainee at a bond hearing, was constitutionally adequate.  *Rodriguez Diaz*, 53 F.4th at 1210.  But while both parties at a § 1226(a) bond hearing may have access to information concerning whether an individual is a flight risk or danger, at a § 1231(a) hearing the evidence concerning whether there is a significant likelihood of removal is far more likely to be in the hands of the government than with an individual detainee, as that likelihood would largely depend on inter-governmental agreements and communications between the United States and the foreign country.[13]  *Cf. Rodriguez Diaz*, 53 F.4th at 1212 (noting that the § 1226(a) detainee in that case had "not alleged difficulty obtaining any piece of evidence" bearing on whether he was a flight risk or danger, "much less evidence that would be in the government's hands").  Here, the government appropriately bears the burden of proof as to whether there is a significant likelihood of petitioner's removal in the reasonably foreseeable future to Laos—a country in which petitioner has never even set foot—as the government is much more likely than petitioner to have any such evidence in the form of an agreement or communications between the United States and

---

[12] Although the Supreme Court subsequently held in *Jennings* that the constitutional avoidance canon could not be used to read a bond hearing requirement into the statute—which was the reason that *Singh*, *Diouf*, and *Rodriguez* found bond hearings to be necessary in the first place—the Supreme Court did not address an as-applied constitutional due process challenge. *Jennings*, 583 U.S. at 304–06, 312 ("Because the Court of Appeals . . . had no occasion to consider respondents' constitutional arguments on their merits[,] . . . we do not reach those arguments."). *Singh* "relied on the Due Process Clause in determining" who should bear the burden of proof at a bond hearing.  *Rodriguez Diaz*, 53 F.4th at 1202; *see also Singh*, 638 F.3d at 1203–06.  The issue of the burden of proof at a hearing required by due process therefore appears to remain governed by *Diouf* and its extension of *Singh*'s requirements to bond hearings for § 1231(a) detainees.

[13] Additionally, "[s]ection 1226(a) offers substantial procedural protections to detained persons." *Rodriguez Diaz*, 53 F.4th at 1194.

16

Laos.

### b. Irreparable Harm

Petitioner also faces irreparable harm absent a preliminary injunction. "Obviously, the [unlawful deprivation] of liberty is a . . . severe form of irreparable injury." *Ferrara v. United States*, 370 F. Supp. 2d 351, 360 (D. Mass. 2005); *Hernandez v. Sessions,* 872 F.3d 976, 999 (9th Cir. 2017) (noting that "unlawful detention certainly constitutes extreme or very serious damage, and that damage is not compensable in damages"). The Ninth Circuit has recognized that there may be numerous "irreparable harms imposed on anyone subject to immigration detention," such as "the economic burdens imposed on detainees and their families as a result of detention, and the collateral harms to children of detainees whose parents are detained." *Hernandez,* 872 F.3d at 999. Moreover, "[i]t is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Id.* at 994 (quoting *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012)). "When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Warsoldier v. Woodford*, 418 F.3d 989, 1001–02 (9th Cir. 2005) (quoting Wright, Miller, & Kane, Federal Practice and Procedure, § 2948.1 (2d ed. 2004)). Petitioner has thus established that he will suffer irreparable harm absent a preliminary injunction.

### c. Balance of Equities and Public Interest

When the government is the nonmoving party, "the last two *Winter* factors merge." *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023) (internal citations omitted). Although the government has a strong interest in enforcing the immigration laws, it "cannot reasonably assert that it is harmed in any legally cognizable sense" by being compelled to follow the law. *Zepeda v. I.NS.,* 753 F.2d 719, 727 (9th Cir. 1983).

The public interest also weighs in petitioner's favor. "The public has a strong interest in upholding procedural protections against unlawful detention, and the Ninth Circuit has recognized that the costs to the public of immigration detention are staggering." *Diaz*, 2025 WL 1676854, at *3 (citing *Jorge M.F. v. Wilkinson*, No. 21-CV-01434-JST, 2021 WL 783561, at *3) (N.D. Cal. Mar. 1, 2021).

**d. Remedy**

In conclusion, the Court finds that the requirements for issuing a preliminary injunction are met. The purpose of a preliminary injunction is to return the parties to the status quo ante, which is "not simply [] any situation before the filing of a lawsuit, but instead [] 'the last uncontested status which preceded the pending controversy.'" *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1210 (9th Cir. 2000). Petitioner has shown that he is likely to succeed on his claim that ICE did not have sufficient grounds to re-detain him under the regulations and that his re-detention without a pre-deprivation bond hearing violates the Due Process Clause. His immediate release is required to return him to the status quo ante—"the last uncontested status which preceded the pending controversy." *Hoac v. Becerra*, No. 2:25-CV-01740-DC-JDP, 2025 WL 1993771, at *7 (E.D. Cal. July 16, 2025); *see also Nguyen v. Scott*, No. 2:25-CV-01398, 2025 WL 2419288, at *28 (W.D. Wash. Aug. 21, 2025) (ordering immediate release of noncitizen detained in violation of regulations).

**VI. Conclusion and Order**

Accordingly,

1. The motion for preliminary injunction, Doc. 3, is GRANTED.
2. Respondents are ORDERED to release petitioner immediately.
3. Respondents are ENJOINED AND RESTRAINED from re-detaining petitioner unless respondents show, at a pre-deprivation hearing before a neutral decisionmaker, that there are material changed circumstances which demonstrate that there is a significant likelihood of petitioner's removal in the reasonably foreseeable future, or unless respondents demonstrate by clear and convincing evidence that petitioner is a flight risk or danger to the community such that his physical custody is legally justified.
4. The bond requirement of Federal Rule of Civil Procedure 65(c) is waived. Courts regularly waive security in cases like this one. *See, e.g. Zakzouk v. Becerra*, No. 25-CV-06254-KAW, 2025 WL 2899220, at *8 (N.D. Cal. Oct. 10, 2025); *Khan v. Noem*, No. 1:25-CV-01411-EPG-HC, 2025 WL 3089352, at *11 (E.D. Cal. Nov. 5, 2025).
5. Respondents may file an additional brief related to the merits of the petition within 30

days, and petitioner may file a reply brief within 15 days of respondents' brief. Alternatively, the parties may stipulate to a different briefing schedule or to submitting the petition on the merits based on the current record.

IT IS SO ORDERED.

Dated:   November 24, 2025

_____
UNITED STATES DISTRICT JUDGE